10-3284-cr(L)
United States v. Batista

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: January 26, 2012)                                    Decided: May 17, 2012)

Docket Nos. 10-3284-cr(L), 10-4024-cr(CON)

───────────────────────────────────────────

UNITED STATES OF AMERICA,

*Appellee,*

v.

VIRGILIO HICIANO, DEYANIRA SANCHEZ, *a/k/a* YANIRA, RAPHAEL RODRIGUEZ, *a/k/a* CHUCHO,
HENRY CONDE, WILLIAM VALERIO, MIGUEL SANTO, *a/k/a* MIGUEL SANTOS, *a/k/a* EL MECANICO,

*Defendants,*

LUIS M. BATISTA, ALEXANDER ALCANTARA, *a/k/a* MORENO,

*Defendants-Appellants.*

───────────────────────────────────────────

Before: KEARSE, CABRANES, and SACK, *Circuit Judges.*

Defendants-appellants Luis Batista and Alexander Alcantara appeal from separate judgments of

conviction entered in the United States District Court for the Eastern District of New York (Dora L.

Irizarry, *Judge*).  We find no error in the District Court's thorough and reasoned analysis with regard to

either defendant.  We therefore AFFIRM the judgments of the District Court.

> DONALD DUBOULAY, Law Offices of Donald duBoulay, New
> York, NY; Daniel S. Nooter, Washington, DC, *on the
> brief, for* defendant-appellant Alexander Alcantara a/k/a
> Moreno.

1

BERNARD V. KLEINMAN, Law Office of Bernard V. Kleinman, PLLC, White Plains, NY, *for* defendant-appellant Luis M. Batista.

ANTHONY M. CAPOZZOLO, Assistant United States Attorney (Susan Corkery and Emily Berger, Assistant United States Attorneys, *of counsel*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for* appellee the United States of America.

JOSÉ A. CABRANES, *Circuit Judge*:

Defendants-appellants Luis Batista and Alexander Alcantara appeal from separate judgments of conviction entered in the United States District Court for the Eastern District of New York (Dora L. Irizarry, *Judge*), on August 11, 2010, and September 27, 2010, respectively.

Batista appeals from the District Court's judgment convicting him after a jury trial of: (1) conspiracy to distribute cocaine, cocaine base, and ecstasy, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(C); (2) conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1349 and 1344; (3) bank fraud, in violation of 18 U.S.C. § 1344; and (4) obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and sentencing him principally to a 180-month term of imprisonment and a $25,000 fine.

Alcantara appeals from the Court's judgment convicting him after a guilty plea of (1) conspiring to distribute and possess with intent to distribute fifty grams or more of cocaine base and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); and (2) distribution of and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); and sentencing him principally to a 120-month term of imprisonment.

We have considered each of the appellants' arguments, and having carefully reviewed the record and the judgments of the District Court, we affirm the judgments of the District Court in their entirety.

2

## BACKGROUND

In 2007 and 2008, Luis Batista, a ten-year veteran of the New York City Police Department ("NYPD"), and Alexander Alcantara were indicted in connection with their membership in a large narcotics trafficking ring centered in Bushwick run by one Virgilio Hiciano. In a superseding indictment filed on August 13, 2008, Batista was charged with: (1) conspiracy to distribute cocaine base ("crack"), cocaine, and ecstasy in violation of 21 U.S.C. §§ 846 and 841(a)(1); (2) conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1349 and 1344; (3) bank fraud in violation of 18 U.S.C. § 1344; and (4) one count of obstruction of justice and one count of conspiracy to obstruct justice in violation of 18 U.S.C. §§ 1512(k) and 1512(c)(2). Alcantara was charged in a separate superseding indictment on May 14, 2008, with: (1) conspiring to distribute and possess with intent to distribute fifty grams or more of cocaine base and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(iii), and 841(b)(1)(A)(ii)(II); and (2) distribution and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II).

### A. The Conspiracy

The factual background set forth below is drawn from the record of these related proceedings, taken "in the light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

In or about 1992, Batista befriended Hiciano, then a low-level narcotics dealer in a minor Bushwick drug ring. Batista joined the NYPD in 1997 and was promoted to detective in 2004. As the years went by and both Hiciano and Batista rose in the ranks of their respective organizations, Batista and Hiciano continued to socialize several times per week.[1] Often, Hiciano or someone else from his drug ring would pay for Batista's drinks. On some occasions, after nights of drinking, Batista would

---

[1] Hiciano testified at trial that Batista was aware of his drug-related activities during the friendship.

instruct Hiciano to let Batista drive because, as a police officer, he did not need to fear arrest for driving while intoxicated.

By 1999 or 2000, Hiciano had taken over the leadership of the Bushwick drug ring, and the ring grew to be one of the largest in that area of Brooklyn. The government alleges that Hiciano's friendship with Batista, by that time an undercover narcotics officer, then began to pay off: From the late 1990s until 2006, Batista provided Hiciano with a steady and reliable stream of information about police activity in Hiciano's part of Bushwick. Among other services provided to the ring, Batista would tell Hiciano to "be careful" when Batista knew the police were scheduled to be at or near Hiciano's location, permitting Hiciano to warn his street-level narcotics dealers that the area was "hot."

In April 2006, Hiciano was arrested and began cooperating with the government. Two months after his arrest, however, Hiciano fled to the Dominican Republic. While there, he was visited by an "enforcer," who represented several drug suppliers to whom Hiciano owed money, including Alcantara. Apparently as a result of the enforcer's visit, Hiciano's girlfriend—whom Hiciano had left in charge of the Bushwick drug ring—turned over two vehicles to one of the suppliers in order to pay part of the ring's debt.[2] Hiciano was extradited to the United States in October 2007, and shortly thereafter resumed cooperating with investigators.

On August 23, 2006, shortly after Hiciano had fled the country, Alcantara was arrested and immediately agreed to cooperate with investigators. While he originally claimed that he was merely a drug courier, he eventually admitted that he was a major seller of narcotics to Hiciano's organization. He testified at Batista's trial that he had sold Hiciano between 80 and 110 kilos of cocaine through the course of their extended business relationship. The evidence at this trial confirmed that Alcantara was Hiciano's "main supplier."

---

[2] At another point in time, Alcantara himself set fire to a vehicle he believed belonged to Hiciano in order to intimidate him into paying his debts.

4

Alcantara and Hiciano also testified at trial about numerous telephone calls that passed between Batista and Hiciano while Hiciano was the leader of the Bushwick drug ring. In many of those calls, Batista warned Hiciano of impending police activity at 441 Wilson Avenue, Hiciano's base of operations. Investigators also discovered that Batista, at Hiciano's request, had gained access to internal NYPD databases to determine whether there was any record of outstanding warrants, tickets, or fines attributable to Hiciano. Further, on at least one occasion, Batista gained access to an NYPD database in order to determine whether a break-in at another apartment used by Hiciano, located at 1127 Decatur Street, was a police raid. Telephone records introduced at trial indicated that Batista was on the telephone with Hiciano while searching the database.

In late 2006, largely on the basis of information provided by Alcantara, federal investigators applied for and received authorization under Title III[3] to place a wiretap on Batista's telephone. Prior to trial, Batista moved to suppress the evidence of the wiretaps performed by federal investigators, but the District Court denied the motion. *United States v. Batista*, No. 06-CR-265 (DLI), 2009 WL 910357, at *1 (E.D.N.Y. Mar. 31, 2009) ("*Batista I*").

## B. The Trial

At trial, both Alcantara and Hiciano testified against Batista. Hiciano testified to the extent of Batista's involvement in the drug conspiracy, explaining that Batista would advise him to "be careful"[4] when police activity around 441 Wilson Avenue was imminent, and that, at Hiciano's request, Batista would perform inquiries in various NYPD internal databases. Hiciano also testified that he kept a gun at 441 Wilson Avenue for the protection of the drug ring, and that Alcantara had provided him with between 150 and 200 kilos of cocaine during the five years of the conspiracy charged in the indictment.

---

[3] *See* Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*

[4] Because Batista and Hiciano would converse in Spanish, Batista used the term "cuídate." On appeal the parties dispute the English meaning of the term, but testimony established the meaning we use here. *See* note 13, *post.*

Alcantara confirmed Hiciano's testimony about Batista's extensive involvement with the drug ring and with Hiciano's social life, although he testified differently about the number of kilograms of cocaine that he (Alcantara) had provided to Hiciano's organization.

Batista testified in his own defense, claiming that he had never given information to Hiciano about police activity in Bushwick, and that his relationship with Hiciano was exclusively a social one. He admitted that he continued to accept free drinks from Hiciano after learning that Hiciano was involved in criminal activity, and to other unlawful acts unrelated to Hiciano, but vehemently disputed the government's contention that he had conspired with Hiciano to protect the latter's narcotics trafficking organization.

Batista was convicted by the jury on all charges.[5] After the jury returned its verdict, Batista moved for a judgment of acquittal under Rule 29[6] of the Federal Rules of Criminal Procedure, or in the alternative, for a new trial pursuant to Rule 33[7] of the Federal Rules of Criminal Procedure. The District Court granted Batista's Rule 29 motion as to the conspiracy to obstruct justice charge, in light of the acquittal at trial of the sole alleged co-conspirator. *United States v. Batista*, No. 06-CR-265 (DLI), 2010 WL 1193314, *10–12 (E.D.N.Y. Mar. 24, 2010) ("*Batista II*"). The remainder of the verdict was left undisturbed.

---

[5] A co-defendant, fellow police officer Henry Conde, was acquitted on charges that he obstructed and conspired to obstruct justice by keeping Batista informed of an internal NYPD investigation focusing on Batista's connections to the narcotics trade.

[6] Rule 29 provides, in pertinent part, that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict." Fed. R. Crim. P. 29(c)(1).

[7] Rule 33 provides, in pertinent part, that "[u]pon the defendant's motion [after the entry of a guilty verdict], the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

## C. Sentencing

At Batista's sentencing on June 10, 2010, the District Court found that the narcotics conspiracy of which he had been convicted involved possession of a firearm and therefore imposed a two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(1). Finding that Batista had made materially false statements to investigators and had committed perjury on the witness stand, the Court also imposed a two-level enhancement for obstruction of justice, under U.S.S.G. § 3C1.1. The Court declined to grant a downward adjustment for a minor or minimal role pursuant to U.S.S.G. § 3B1.2.

The Court concluded that Batista's adjusted Guidelines level was 44, corresponding to a recommended sentence of life imprisonment. Finding that a sentence of life imprisonment would be too harsh, and that a sentence at the mandatory minimum of 120 months would be too lenient, the Court imposed a non-Guidelines sentence consisting primarily of 180 months in prison and a fine of $25,000.

Alcantara was sentenced three months later, on September 15, 2010. On the basis of the government's representation that Alcantara had extensively and productively cooperated with investigators, and on its own observation that his testimony at Batista's trial was truthful, the District Court granted the government's motion for a downward departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). It then imposed a two-level Guidelines enhancement for obstruction of justice under U.S.S.G. § 3C1.1, a four-level enhancement under U.S.S.G. § 3B1.1(a) for a leadership role in the offense, and a two-level enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)(1). The Court also found that Alcantara was responsible for over 150 kilograms of cocaine, rather than the 80 to 110 kilograms Alcantara had admitted to selling at trial.[8]

---

[8] At sentencing, Alcantara challenged the enhancements for obstruction of justice and for a leadership role, as well as the weight of the cocaine attributable to him, but not the enhancement for possession of a firearm.

The District Court calculated Alcantara's adjusted Guidelines level to be 43, with a recommended sentence of life imprisonment. Having granted the government's motion for a downward departure, the Court imposed a non-Guidelines sentence of 120 months in prison.

### D. These Appeals

On appeal, Batista argues that his conviction and sentence should be vacated for eight reasons: (1) the evidence was insufficient to sustain a verdict of guilty on Count One, which charged membership in a conspiracy to possess and distribute cocaine and ecstasy; (2) the government was permitted to introduce evidence at trial that was unduly prejudicial and had little or no probative value; (3) at least one juror slept during parts of the trial, thereby depriving Batista of due process of law; (4) the District Court violated the Court Interpreters Act[9] by testifying to the jury as to the correct translation of a Spanish word; (5) the District Court erred in applying sentencing enhancements for obstruction of justice and possession of a firearm in the course of committing a narcotics offense, and by denying sentencing reductions for an alleged minor or minimal role in the offense; (6) the District Court erred in denying the defendant's request for a *Franks*[10] hearing regarding the Title III wiretapping warrants; (7) the District Court erred in imposing a fine of $25,000; and (8) the government had engaged in prosecutorial misconduct during its summation by improperly characterizing evidence presented at trial and by otherwise making improper statements.

Alcantara argues on appeal that the District Court's sentence was both procedurally and substantively unreasonable, contending that: (1) the Court erroneously calculated his base offense level by holding him responsible for 150 kilograms of cocaine and 4.5 kilograms of crack; (2) the Court improperly applied an upward adjustment for obstruction of justice; (3) the Court wrongly applied a

---

[9] 28 U.S.C. § 1827.

[10] *Franks v. Delaware*, 438 U.S. 154 (1978).

four-level enhancement for his role in the offense; and (4) the sentence imposed was substantively unreasonable because it was twice the sentence imposed upon another, allegedly more culpable, individual convicted in the offense.

## DISCUSSION

We have considered all of the appellants' claims on appeal and find them to be without merit. We address below only those that merit some degree of special attention.

### A. Batista

### 1. The Sleeping Juror

Batista argues that he was denied due process of law when at least one juror allegedly slept through parts of his trial. Because the District Court is uniquely able to "'continuous[ly] observ[e] . . . the jury in court,'" we ordinarily review the Court's "'handling of alleged juror misconduct . . . for abuse of discretion.'" *United States v. Diaz*, 176 F.3d 52, 78 (2d Cir. 1999) (quoting *United States v. Panebianco*, 543 F.2d 447, 457 (2d Cir. 1976)). In this case, however, because defense counsel never requested that the juror be removed from the panel, we review the Court's decision not to excuse the juror *sua sponte* for plain error. *See, e.g.*, *United States v. Fernandez-Hernandez*, 652 F.3d 56, 75 (1st Cir. 2011) (where defense counsel "alerted the trial court" that a juror was "falling asleep," but failed to "raise any due process objection" at the time, the trial court's failure to remove the juror *sua sponte* was subject to plain error review) (internal quotation marks omitted); *cf. United States v. Simels*, 654 F.3d 161, 168 (2d Cir. 2011).

An action is plainly erroneous where there is "(1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks and alteration omitted). If we find that an action is plainly erroneous, we "may then exercise [our]

9

discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and alteration omitted).

The error alleged by Batista was waived at trial.[11]  Even if the error had not been waived, however, the District Court did not plainly err in the way it handled the allegedly sleeping juror.  The juror's inattentiveness was brought to the attention of the District Court several times, and the Court closely monitored the situation throughout the trial.  The Court repeatedly addressed the issue with the parties on the record, and it interviewed the juror at least once.  Both the government and defense counsel had ample opportunity to request the juror's removal; defense counsel in fact was invited by the government to object to the juror's conduct, and declined to do so, on at least two occasions.  Defense counsel may simply have concluded that the risk that the juror might have missed important exculpatory testimony was a tolerable one. *See United States v. Ferguson*, __ F.3d __, 2011 WL 6351862, at *14 (2d Cir. Dec. 19, 2011) ("[O]ur review for plain error is more rigorous where the failure to object was a strategic decision . . . ." (internal quotation marks and alterations omitted)); *United States v. Viola*, 35 F.3d 37, 42 (2d Cir. 1994) ("It is proper to hold a defendant accountable . . . [for] strategically withholding an objection in order to seek reversal on appeal."), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997).

---

[11] As the Supreme Court has stated, "[w]aiver is different from forfeiture.  Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).  An argument forfeited by the defendant may still be reviewed according to a plain error standard, but no such review is available when the defendant has affirmatively waived his right to object to the court's action. *See id.* at 733–34; *United States v. Kon Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995).

In the case on appeal, defense counsel clearly waived, rather than forfeited, its objections to the District Court's handling of the sleeping juror.  In one instance, defense counsel declined the government's suggestion that he request the juror's removal, responding that he would have "no problem bringing to the court anything that's on our minds to protect the defendant."  On another occasion, the government again invited the defense to raise an objection to the juror.  Defense counsel responded, "[D]uring my summations, I started walking in his direction. [E]very time he saw me, he seemed fine."  Counsel for Batista's co-defendant reiterated simply: "No motion, Judge."

We decline to disturb the Court's careful and considered judgment on this issue. *See Diaz*, 176 F.3d at 78 (upholding conviction where the court had, "from the moment the sleeping juror allegation was raised, investigated the matter and carefully observed the juror in question throughout the trial"). The District Court's decision to permit the juror to continue and to deliberate was not an abuse of discretion, much less plainly erroneous.

## 2. Court Interpreters Act

Batista also contends that the District Court violated the Court Interpreters Act of 1978, 28 U.S.C. § 1827, by instructing the court interpreter to employ a particular translation of a Spanish slang phrase that Hiciano testified that Batista had used to warn him of police activity. Because Batista did not object to the Court's instruction at the time, he has waived the argument for purposes of appeal.[12] Even if the argument were not waived, we would find that the District Court did not plainly err.

The controversy arose when Hiciano, in testimony regarding a code he had worked out with Batista to signal police presence in Bushwick, stated that Batista would use the phrase "*loco cuídate*" to warn of imminent police action. The meaning of the phrase is arguably ambiguous: it could mean either "take care, dude"—perhaps innocuous enough—or "be careful, dude," which was perhaps less innocuous given the context in which the phrase was uttered.[13]

Faced with a potentially decisive issue of translation, the District Court suggested that the witness himself, who was evidently conversant in both English and Spanish, could clarify what he understood Batista to mean by "*loco cuídate*" and thereby establish the interpretation to be used by the court interpreter. The Court therefore, with the permission of the parties, elicited testimony from

---

[12] *See* note 11, *supra.*

[13] Although the primary dispute between the parties related to the translation of "*cuídate*," Hiciano also testified to the translation of the word "*loco.*" *Loco* literally means "crazy." Arturo Cuyás, Appleton's Revised Spanish Dictionary 343 (Helen S. Eaton & Walter Beveraggi-Allende, eds., 4th ed. 1956). However, Hiciano clarified that he used the word to mean "dude." We find no error in the District Court's decision to defer to Hiciano's translation of the term.

11

Hiciano, outside the presence of the jury, regarding his intended meaning. Hiciano confirmed that he understood Batista to mean "be careful," not "take care" and that Hiciano appreciated the difference between the two meanings. The Court then inquired of counsel for both sides whether they objected to the translation given by the witness, and both sides declared that they had no objection. Only then did the Court instruct the interpreter to use the agreed-upon translation. The Court's action was entirely reasonable; it was not erroneous, much less plainly erroneous.[14]

### 3. The Allegedly Improper Closing Arguments

In the appendix to his opening brief, Batista compiles thirty statements made by the government in its summation, each of which, he contends, was improper. Of the thirty statements listed, Batista objected at trial to only two. We therefore address principally those two statements, and review the government's summation for "egregious misconduct."[15] *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (internal quotation marks omitted); *see also United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993) ("[T]he misconduct alleged must be so severe and significant as to result in the denial of [the defendant's] right to a fair trial.").

A defendant alleging prosecutorial misconduct ordinarily bears "a heavy burden." *Locascio*, 6 F.3d at 945. In this case, because the two objections asserted by defendant's counsel were sustained and the District Court promptly provided the jury with curative instructions, and because we presume

---

[14] To the extent Batista's contention that the District Court "overstepped [its] bounds" by employing the translation procedure described above seeks to challenge the procedure by which the Court inquired of Hiciano's interpretation of the key phrase, such a procedural challenge was likewise waived. Batista's counsel was offered the opportunity to object to the Court's proposed procedure, but demurred. Batista may not raise an argument on appeal that he specifically declined to raise before the District Court.

[15] Those comments to which Batista did not object at trial, we review for plain error. *United States v. Fell*, 531 F.3d 197, 218 (2d Cir. 2008) ("Since Fell failed to object to the prosecution's comments [in its closing argument], we review for plain error."); *see Johnson*, 520 U.S. at 463. Batista has not pointed to any way in which the comments affected his substantial rights or the fairness of the proceeding, and we have found none upon our own review. We therefore find no plain error. *See United States v. Draper*, 553 F.3d 174, 179 (2d Cir. 2009) ("A plain error should be remedied by a reviewing court only if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings." (internal quotation marks omitted)).

that a jury follows the instructions of the court, the burden is even higher. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993) ("[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'" (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987))).

Upon consideration of the two challenged comments in the context of the entire record, including the trial transcript, *see United States v. Canniff*, 521 F.2d 565, 571 (2d Cir. 1975), it is clear to us that neither statement rose to the "egregious" level required to overturn a jury verdict, *see Elias*, 285 F.3d at 190. The first comment—an observation that Batista's co-worker and alleged co-conspirator William Valerio had pleaded guilty to bank fraud—referred to a fact already in the record (albeit in a different context). The second, in which the government apparently attempted to appeal to the jury's sense of public duty, was immediately cured by the District Court: it reminded the jurors that their role was not to make a public policy determination, but to decide whether the government had met its burden of proving beyond a reasonable doubt each and every element of the charged crimes. Although perhaps inappropriate, neither comment by the prosecutor, in context, was so "severe and significant" as to deny Batista his right to a fair trial. *Locascio*, 6 F.3d at 945.

### 4. The Sentencing Enhancement for Possession of a Firearm

Batista argues that the District Court improperly applied a two-level enhancement to his offense level under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm in connection with a drug trafficking offense. The imposition of a sentencing enhancement under § 2D1.1(b)(1) involves questions of fact that we review for clear error. *United States v. Stevens*, 985 F.2d 1175, 1188 (2d Cir. 1993) ("The sentencing court's finding that a firearm was possessed in connection with a drug offense for purposes of § 2D1.1 will not be overturned unless it is clearly erroneous.").

13

In order for a defendant's projected Guidelines sentence to be enhanced under § 2D1.1(b)(1), "'[t]he defendant need not have had personal possession, or even actual knowledge of the weapon's presence; the enhancement is required so long as the possession of the firearm was reasonably foreseeable to the defendant.'" *United States v. Giraldo*, 80 F.3d 667, 677 (2d Cir. 1996) (quoting *Stevens*, 985 F.2d at 1188) (*abrogated on other grounds by Muscarello v. United States*, 524 U.S. 125 (1998)). Accordingly, if one member of a narcotics conspiracy possessed a firearm in furtherance of the conspiracy, the other members of the conspiracy who reasonably could have foreseen such possession are chargeable with possession under § 2D1.1(b)(1). *United States v. Soto*, 959 F.2d 1181, 1186–87 (2d Cir. 1992).

Batista argues that imposition of a sentencing enhancement for possession of a firearm is inappropriate because a firearm was not found in physical proximity to him, and because Hiciano never informed him that a member of the narcotics conspiracy possessed a firearm. This argument is unavailing. As we have recognized in the past, "to substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia." *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987); *see also United States v. Bermudez*, 529 F.3d 158, 170 (2d Cir. 2008) ("It is axiomatic that drug dealing and guns go hand in hand."). Although a physical nexus between the defendant and the firearm is often useful in determining possession, such a nexus is by no means required in order for a court to impose the enhancement. Rather, courts should determine whether, by a preponderance of the evidence—including evidence relating to a defendant's specialized knowledge regarding the activities of drug gangs—possession of a firearm in connection with the offense was reasonably foreseeable by the defendant.

As the District Court found, Batista was an experienced narcotics detective with the NYPD, who had conducted extensive undercover operations infiltrating illegal narcotics operations, and who

14

was well aware that "drug dealers are often armed." *Batista III*, 732 F. Supp. 2d at 98. Batista knew the general size and scope of Hiciano's drug ring, and he could easily have foreseen that someone would possess a firearm in relation to the illegal activities of the ring. Indeed, Hiciano himself kept a firearm in an apartment in 441 Wilson Avenue[16] in order to protect his drug trade. Although no evidence was adduced to show that Hiciano had expressly told Batista that he or one of his associates possessed a firearm, the District Court did not err, much less commit clear error, when it found that "it was reasonably foreseeable to Batista that a firearm would be used in the course of the conspiracy." *Id.* at 96.

### 5. The Remaining Issues

The majority of Batista's remaining arguments on appeal were addressed by the District Court in four thorough and well-reasoned opinions spanning the lifetime of the case. *See Batista III*, 732 F. Supp. 2d 82 (addressing sentencing issues including minimal/minor role reduction and obstruction of justice enhancement); *Batista II*, 2010 WL 1193314 (rejecting in part Batista's motion for a judgment of acquittal under Fed. R. Crim. P. 29, rejecting entirely his motion for a new trial under Fed. R. Crim. P. 33, and holding that the government had presented sufficient evidence at trial to support a guilty verdict on all counts other than conspiracy to obstruct justice); *United States v. Batista*, No. 06-CR-265, 2009 WL 3134561 (E.D.N.Y. Sept. 23, 2009) (addressing admission of evidence challenged as unduly prejudicial); *Batista I*, 2009 WL 910357 (addressing the suppression and *Franks* hearing issues).

We find no error in any of the District Court's holdings, and we affirm the judgment of the District Court as to Batista.

---

[16] As noted above, 441 Wilson Avenue served as a base of operations for Hiciano's drug ring.

### B. Alcantara

Alcantara, who pleaded guilty pursuant to an agreement with the government, raises a number of sentencing issues on appeal.

### 1. Quantity of Drugs

Alcantara argues that the District Court erred in calculating his base offense level when it found, by a preponderance of the evidence, that he should be held responsible for at least 150 kilograms of cocaine. "When a district court makes a finding of fact with respect to the amount of drugs attributable to a defendant, we review that finding for clear error." *United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010). Such a finding may rest on a preponderance of the evidence. *United States v. Jones*, 531 F.3d 163, 175 (2d Cir. 2008). Where, as here, there has been no seizure of narcotics (or the amount of narcotics seized does not properly reflect the magnitude of the criminal conspiracy), a sentencing judge is authorized to "approximate" the relevant drug quantity. *See id.*

We need not resolve whether the District Court erred in finding by a preponderance of the evidence that Alcantara was responsible for at least 150 kilograms of cocaine. As the District Court explained, evidence that Alcantara knew that Hiciano's ring dealt in crack cocaine as well as powder cocaine, and knew of the quantity of crack that could be made from the quantity of powder he sold to Hiciano, supports the District Court's finding, by a preponderance of the evidence, that Alcantara could and should be held responsible for at least 4.5 kilograms of crack cocaine. The District Court did not clearly err in reaching this conclusion.

### 2. Role in the Offense

Alcantara challenges the enhancement of his offense level by four levels pursuant to U.S.S.G. § 3B1.1(a), which provides that a defendant's offense level should be enhanced if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *Id.*

"While the criminal activity must be found to have involved five or more participants, the defendant need not have been the leader of more than one other participant for this adjustment to apply." *United States v. Chavez*, 549 F.3d 119, 136 (2d Cir. 2008). We will overturn "[t]he sentencing court's findings as to the defendant's role in the offense . . . only if they are clearly erroneous." *United States v. Farah*, 991 F.2d 1065, 1068 (2d Cir. 1993); *see United States v. Zichettello*, 208 F.3d 72, 107 (2d Cir. 2000).

### a. Determining the Appropriate Enhancement

As an initial matter, Alcantara argues that the District Court erred in enhancing his offense level by four levels—the designated enhancement for "leaders" or "organizers"—rather than three levels—the designated enhancement for "managers" or "supervisors"—because the Court classified him at sentencing as a "supervisor," rather than as a "leader" or "organizer." *See United States v. Gotti*, 459 F.3d 296, 348 (2d Cir. 2006) (noting that "U.S.S.G. § 3B1.1(b) provides for a three-level enhancement if 'the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants'" (quoting § 3B1.1(b))).

Both the Court's use of the word "supervisor" and its citation to § 3B1.1(c)[17] (rather than §§ 3B1.1(b) or (a)) appear to have been simple misstatements, and did not reflect the Court's factual findings. The Pre-Sentence Report ("PSR") and the government had both argued for a four-level leadership role enhancement.[18] The District Court also expressly found that the evidence showed "a hierarchy"; that Hiciano represented the "whole organization"; and that "on the top [we] have Alcantara," who "certainly exercise[d] a certain amount of control" over Hiciano. The Court then stated that it was "in agreement with the Government and also with probation's assessment that the

---

[17] U.S.S.G. § 3B1.1(c) provides for a two-level enhancement for a leader, organizer, manager, or supervisor in any criminal activity with fewer than five participants. *See United States v. Djelevic*, 161 F.3d 104, 106 n.3 (2d Cir. 1998) ("Section 3B1.1(c) provides for a two-level enhancement if the criminal activity involve[s fewer] than five participants.").

[18] Alcantara also notes that the government initially argued for only a two-level enhancement, rather than a four-level enhancement. It seems that the government's position was a slip of the tongue, rather than a statement of its actual intent, as its written filings refer to a four-level or leader-or-organizer enhancement.

17

defendant is entitled to the aggravating four-point enhancement." The sentencing record reveals no discussion of other types of role enhancements. We have no reason to believe the Court intended to impose anything other than the four-level "leader or organizer" enhancement.[19]

### b. The Court Did Not Clearly Err By Imposing the Four-Level Enhancement

Alcantara argues that he did not exercise control over Hiciano, and that the District Court's conclusion that he was a leader or organizer of Hiciano's conspiracy was therefore unsupported by the record.

The Court's application of a four-level "leader or organizer" role enhancement was not clearly erroneous. Alcantara was, as the Court observed, a significant supplier of drugs to Hiciano's organization. The Court repeatedly emphasized the influence this position gave Alcantara over Hiciano's management decisions, noting that even though Alcantara did not direct the activities of the distribution ring by issuing orders to its lower-ranked members, his control over Hiciano affected the operation of the distribution ring as a whole.[20] The Court explained that Alcantara's position as Hiciano's creditor enabled him to require Hiciano to increase the distribution ring's sales efforts (or otherwise alter its activities) in order to pay the ring's debts, and that therefore the enhancement was appropriate. ndeed, the Court noted at least one instance in which Alcantara set fire to a vehicle he believed to belong to Hiciano, in order to intimidate Hiciano into paying the more than $90,000 he owed to Alcantara. *Cf. United States v. Bahena*, 223 F.3d 797, 806 (8th Cir. 2000) (enhancement appropriate where defendant threatened to kill two individuals "if they could not show that they had not stolen drugs belonging to him," suggesting defendant had "influenced the[ir] conduct").

---

[19] As we discuss in detail below, any error in the Court's terminology was harmless.

[20] Alcantara concedes that control over one member of a larger conspiracy can be sufficient to impose a four-level enhancement under U.S.S.G. § 3B1.1(a). *See Zichettello*, 208 F.3d at 107.

18

Accordingly, the District Court did not clearly err in determining that Alcantara's influence over Hiciano was sufficient to support a four-level enhancement for a "leader or organizer" role in the offense.[21]

### c. Any Error in the Role Enhancement was Harmless

In any event, even if the District Court could be said to have committed legal error by calling Alcantara a "supervisor" rather than a "leader" or "organizer," or by imposing any role enhancement at all, any such error was harmless. Moreover, where, as here, "the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless." *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) (internal quotation marks omitted); *see United States v. Cavera*, 550 F.3d 180, 197 (2d Cir. 2008) (*en banc*). We hold, for two independent and sufficient reasons, that the record clearly indicates that the role enhancement had no effect on Alcantara's sentence.

First, we note that the District Court sentenced Alcantara principally to 120 months' imprisonment. That term of imprisonment constituted the statutory minimum term applicable to his offense of conviction. See 21 U.S.C. § 841(b)(1)(A). No further departure, short of a safety-valve reduction under 18 U.S.C. § 3553(f) (to which Alcantara does not argue he was entitled), could have reduced his sentence below the statutory minimum. Because Alcantara was sentenced to the statutory

___

[21] Alcantara also argues that the District Court did not make factual findings regarding the number of participants in Hiciano's organization, and therefore was not permitted to impose the leader-or-organizer enhancement. *See United States v. Patasnik*, 89 F.3d 63, 68 (2d Cir. 1996) ("A court must . . . make two specific factual findings before it can properly enhance a defendant's offense level under § 3B1.1(a): (i) that the defendant was 'an organizer or leader,' and (ii) that the criminal activity . . . 'involved five or more participants' or 'was otherwise extensive.'"). But the Court adopted the Amended PSR, which discusses Hiciano's drug ring in detail—including, *inter alia*, its size and scope, and Alcantara's role in supplying the ring. Where, as here, the PSR "state[s] enough facts to permit meaningful appellate review," *United States v. Ware*, 577 F.3d 442, 452 (2d Cir. 2009), the District Court satisfies its obligation to make factual findings by "explicitly adopt[ing]" the relevant factual findings set forth in the PSR, *United States v. Molina*, 356 F.3d 269, 275–76 (2d Cir. 2004); *see also United States v. Fernandez*, 443 F.3d 19, 30–31 (2d Cir. 2006).

minimum term of imprisonment, any error in adding the role enhancement was harmless as a matter of law.

Second, and in the alternative, the District Court clearly intended to grant Alcantara a substantial departure from his Guidelines-recommended sentence. The Court calculated that, with a four-level enhancement and other adjustments, Alcantara's final Guidelines level would be 43, which the Court described as "high." The Court then went on to observe that, even if Alcantara's objections to the PSR—including his objection to the four-level enhancement—had been successful, "the guidelines would still be high."[22] The Court ultimately imposed a non-Guidelines sentence of 120 months, equivalent to at least a twelve-level departure, in large part to recognize Alcantara's "very substantial" cooperation. Moreover, the Court clearly indicated its reluctance to sentence Alcantara to an extended term of imprisonment, in part because of his youth. We hold that the Court's statements on the record at sentencing are sufficient for us to conclude that the role enhancement did not affect Alcantara's sentence.

We therefore hold that, even if the District Court had not applied the four-level role enhancement, Alcantara's sentence would have been the same, and that any error in arriving at his sentence was harmless.

### 3. Other Issues

We have considered the remainder of Alcantara's arguments on appeal, and find that they are meritless. We therefore affirm the judgment of the District Court as to Alcantara.

---

[22] Had the District Court imposed only a three-level supervisory role enhancement, Alcantara's adjusted offense level would have been 42, calling for a sentencing range of 360 months to life. A two-level enhancement would have rendered an adjusted offense level of 41, or 324–405 months. And a wholesale rejection of a role adjustment would have rendered an adjusted offense level of 39, or 262–327 months—still more than twice the sentence actually imposed. *See* U.S.S.G. § 5A (2010).

**CONCLUSION**

Having conducted an independent review of the record, we find no error in the District Court's thorough and considered analysis of defendants' various claims. To the extent defendants have raised claims that were not initially brought before the District Court, we hold that they did not reveal error, much less plain error. These complex proceedings were conducted with care and fairness. The judgments of the District Court are AFFIRMED.