11-4711-cr
USA v. Praddy

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2012

(Argued: November 15, 2012                                    Decided: July 30, 2013)

Docket No. 11-4711-cr

_____

UNITED STATES OF AMERICA,

                                        Appellee,

                        - v. -

ANTHONY PRADDY, aka Birdman,

                                        Defendant-Appellant.
_____

Before: KEARSE, STRAUB, and POOLER, Circuit Judges.

        Appeal from a judgment of the United States District Court for the Eastern District of

New York, Frederic Block, Judge, convicting defendant of racketeering, narcotics, and firearm

offenses, see 18 U.S.C. §§ 1962(c) and (d), 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C.

§ 924(c)(1).

        Affirmed as to the racketeering and narcotics offenses; reversed as to the firearm

conviction on statute-of-limitations grounds; remanded for resentencing in light of that reversal.

                        KENJI PRICE, Assistant United States Attorney, Brooklyn, New York
                        (Loretta E. Lynch, United States Attorney for the Eastern District of
                        New York, Jo Ann M. Navickas, Seth D. DuCharme, Assistant United
                        States Attorneys, Brooklyn, New York, on the brief), for Appellee.

MITCHELL J. DINNERSTEIN, New York, New York (Thomas Eddy, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Anthony Praddy appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Frederic Block, Judge, convicting him of conducting or participating in the conduct of the affairs of a drug-distribution racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count One); conspiring to do so, in violation of 18 U.S.C. § 1962(d) (Count Two); conspiring to possess and distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846 (Count Four); four counts of distributing marijuana, in violation of 21 U.S.C. § 841(a)(1) (Counts Five, Six, Seven, and Eight); and possession of a firearm in connection with the narcotics conspiracy offense, in violation of 18 U.S.C. § 924(c)(1) (Count Fourteen). Praddy was sentenced to, inter alia, 120 months' imprisonment on the racketeering and narcotics charges, to be followed by a 60 months' term of imprisonment on the firearm charge. On appeal, he principally (1) challenges the sufficiency of the evidence to support his convictions on Counts One, Two, and Four, and (2) contends that his conviction on Count Fourteen should be reversed because there was no evidence that he possessed a firearm within the five-year statute-of-limitations period. Praddy also challenges his sentence on the RICO and narcotics counts, contending principally that the district court gave inappropriate weight to various aspects of his conduct. We find merit only in Praddy's challenge to his conviction on the firearm count. As to that count we reverse; and we remand for resentencing de novo on the affirmed counts.

# I. BACKGROUND

The present prosecution grew out of state and federal investigations of narcotics trafficking in the East Flatbush area of Brooklyn, New York, in the 1990s and 2000s. A group that sold marijuana in that area, principally on Raleigh Place and on Church Avenue between Raleigh Place and Fairview Place, called the Raleigh Place Crew (or the "Crew"), was led by Raymond Edgar Dowdie. At trial, the government's evidence against Praddy, who was also called "Birdman" or "Bird," chiefly included the testimonies of Dowdie and of Hayden McQuilkin, one of Praddy's marijuana customers, along with audio- and video-taped recordings of Praddy selling marijuana to McQuilkin on several occasions.

Dowdie testified that he had begun selling marijuana with others in the Raleigh Place area (also referred to as "the block") in the 1990s. (See Trial Transcript ("Tr."), at 450-53.) In the mid-1990s a person with whom he had been selling passed away; Dowdie testified, "[on] the day he passed away I just took over the block and appointed certain individuals to work with me." (Id. at 327.) Dowdie identified about a dozen persons who worked with him in selling marijuana, including Praddy's codefendant Kiond Jones ("Kiond"), someone named "Joe," Praddy's cousin Lindsey Breeden ("Lindsey"), and "'Bird' for a period of time." (Id.)

Dowdie described the Raleigh Place operation as one run by a loosely-knit group that was not rigidly hierarchical. There were some street-sellers who were simply considered workers; but all of the other Crew members were considered to be "bosses." (Tr. 460-62.) Kiond and "Joe" served as Dowdie's lieutenants (see id. at 77, 700-01, 709-10) and were bosses (see id. at 461). In general, the members of the Raleigh Place Crew were persons who lived or had grown up on the

block, and most of them were considered bosses. (See id.) As bosses, the Crew members had discretion to choose the sources for the marijuana they sold; they were not required to buy from Dowdie. (See id. at 460-64.)

Dowdie organized the Crew members into teams to work in three shifts, usually manned by two persons, although sometimes a Crew member would work alone. (See Tr. 327-28, 703-04.) The first shift was roughly from 6 a.m. to noon, the second was in the afternoon, and the third ran from the evening until late at night. (See id.) Shanell James, one of the Crew's customers who lived on Raleigh Place, testified that the Crew generally did not sell from about 2 p.m. to 4 p.m. (see id. at 80-81), because "a lot of kids were getting out of school" around then "and . . . more patrols of cops [were] in the area" (id. at 81).

For the periods when Crew shifts were selling, the Crew was protective of its control over the Raleigh Place area. Dowdie testified, "we . . . consider[ed] it was our block"; "[w]e all controlled the block." (Tr. 460-61.) Although people who lived on the block were allowed to sell marijuana there even if they were not members of the Raleigh Place Crew (see, e.g., id. at 347-48), and others (i.e., interlopers) were allowed to sell there during the Crew's off hours (see, e.g., id. at 347-48, 365), Crew members exchanged information as to who was selling on the block (see id. at 374), and interlopers were "run . . . off the block" (id. at 712; see id. at 711-14). Some interlopers who attempted to sell on the block during the Crew's selling hours were dealt with more harshly. Dowdie testified, for example, that he, with the assistance of "Joe" and others, had kidnaped such an interloper, and Dowdie pistol-whipped him as punishment for selling on the block. (See id. at 354-58.) McQuilkin testified that he heard Praddy and Lindsey tell an interloper named Kevon Simon, who was called "Belize," to stop selling on the block and that shortly thereafter McQuilkin

saw Lindsey summon Belize out of a store to the sidewalk and saw Praddy shoot Belize. (See id. at 716-20.)

Dowdie testified that from the mid-1990s until mid-2009, he and the others working with him--who included Praddy, as described in greater detail in Part II below--sold "thousands of pounds" of marijuana. (Id. at 316, 326-27.)

Praddy admitted at trial that he had sold marijuana from 2003--when he was 16 years old--until he was arrested in June 2009 (see Tr. 1103, 1124), and that he had made the marijuana sales to McQuilkin that were captured on audiotape and videotape (see id. at 1119, 1131-32). Praddy testified, however, that he was only an occasional seller, responding to calls he received from would-be buyers. (See, e.g., id. at 1121, 1132-33, 1135.) He testified that he bought marijuana from Dowdie some five or six times, and never more than three or four ounces at a time (see id. at 1109); that he bought marijuana from his codefendant Kiond Jones "[m]aybe once or twice" (id. at 1107); that he had bought marijuana from "Joe" (see id. at 1128); and that he bought from other suppliers beyond the Raleigh Place area (see id. at 1128-29, 1131-32). Praddy testified that his marijuana sales over the years totaled no more than some five or six pounds. (See id. at 1124.) He testified that he worked alone and did not sell marijuana "with" anyone. (See id. at 1107-17.) Praddy also essentially denied that he had shot Belize. (See id. at 1105, 1138.)

## II. THE NARCOTICS AND RICO CONVICTIONS

As indicated above, the jury found Praddy guilty not only of distributing marijuana but also of conspiring to distribute and to possess with intent to distribute marijuana (Count Four), and

-5-

of conducting or participating in the conduct of a RICO drug distribution enterprise, and of conspiring to do so (Counts One and Two, respectively). Praddy challenges the sufficiency of the evidence to support those convictions.

The standard of review with respect to sufficiency challenges is well established. The defendant bears the heavy burden of "show[ing] that no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt." United States v. Caracappa, 614 F.3d 30, 43 (2d Cir. 2010) (internal quotation marks omitted). This Court must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor. See id. "[C]hoices between competing inferences" and "[a]ssessments of witness credibility . . . lie solely within the province of the jury." United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010). The jury is free to believe part, and to disbelieve part, of any given witness's testimony. See, e.g., United States v. Gleason, 616 F.2d 2, 15 (2d Cir. 1979) (jury is entitled to believe a witness "in whole or in part"), cert. denied, 444 U.S. 1082 (1980). "[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. Miller, 116 F.3d 641, 676 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998). We must affirm so long as "the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt." United States v. Buck, 804 F.2d 239, 242 (2d Cir. 1986) (internal quotation marks omitted). These principles apply whether the evidence being reviewed is direct or circumstantial. See Glasser v. United States, 315 U.S. 60, 80 (1942), overruled on other grounds by Bourjaily v. United States, 483 U.S. 171 (1987).

A. Praddy's Membership in the Marijuana Distribution Conspiracy

It is unlawful to conspire to, inter alia, distribute controlled substances such as marijuana. See 21 U.S.C. §§ 846, 841. The essence of the crime of conspiracy, of course, "'is the agreement . . . to commit one or more unlawful acts.'" United States v. Jones, 482 F.3d 60, 72 (2d Cir. 2006) (quoting Braverman v. United States, 317 U.S. 49, 53 (1942) (emphasis ours)), cert. denied, 549 U.S. 1231 (2007). "'The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.'" United States v. Berger, 224 F.3d 107, 114 (2d Cir. 2000) (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990), cert. denied, 501 U.S. 1233 (1991)). Nor need the goals of all the participants be congruent for a single conspiracy to exist, so long as the participants agree on the "essential nature" of the enterprise and "their goals are not at cross purposes." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1192 (2d Cir.) (internal quotation marks omitted), cert. denied, 493 U.S. 933 (1989); see, e.g., United States v. Heinemann, 801 F.2d 86, 92 & n.1 (2d Cir. 1986), cert. denied, 479 U.S. 1094 (1987).

In challenging his conviction on Count Four, conspiracy to distribute marijuana, Praddy does not contend that the government failed to prove the existence of a conspiracy to distribute marijuana in the Raleigh Place area. Rather, he contends that the evidence was insufficient to show that he knowingly became a member of that conspiracy. Although Praddy testified that he sold marijuana only "occasionally" (Tr. 1124), in response to telephone calls asking if he had any to sell (see id. at 1135), and that he did not work "with" anyone--not with Dowdie, or Joe, or Lindsey, or Kiond (see id. at 1109, 1108, 1114, 1107)--there was ample evidence to the contrary.

Dowdie testified that he and Praddy (among others) "worked together." (Id. at 454). Praddy--whose grandmother lived on Raleigh Place, and with whom Praddy sometimes stayed--was

regarded as living on Raleigh Place or having grown up on the block, and was thus allowed to sell on the block. (See id. at 158, 345, 1142, 1160.) Dowdie sold marijuana to Praddy from time to time, sometimes supplying it to him on consignment. (See id. at 517). Praddy and his cousin Lindsey informed Dowdie about interlopers who were poaching on the Crew's territory. (See id. at 374.)

Dowdie testified that Praddy sold marijuana in front of the barbershop on Church Avenue, and that Praddy chose that location in order to minimize the possibility that his grandparents would see him selling drugs. (See Tr. 344-45.) Dowdie testified that Praddy and Lindsey worked together selling marijuana on Church Avenue "[o]n a daily basis." (Id. at 345.)

Dowdie, Kiond, and "Joe" all worked together. Shanell James testified that he "saw them conducting transactions and giving orders and, you know, collecting money and passing packages back and forth" (id. at 77); McQuilkin, who peddled bootleg DVDs on the block for hours at a time (see id. at 701-06, 785-86), testified that he observed Dowdie giving marijuana to other people, including "Joe" and Kiond, to sell. Praddy, who testified that he had bought marijuana from Dowdie some five or six times (see id. at 1109), also listed "Joe" and Kiond among the four or five persons from whom he bought marijuana (see, e.g., id. at 1007, 1128, 1164).

McQuilkin, in 2002-2006, observed that the Crew worked in shifts, and he testified that Praddy was sometimes a member of a shift team: "From six in the morning till 10:00, right, Dre will work. After he finished, then you have it could be Lindsey and Birdman come on that day, it could be Kiond and D, Devon come on that day. It could be Josh and somebody else or it could be one of them by himself." (Id. at 704.)

McQuilkin himself bought marijuana from Praddy; he saw other people buying marijuana from Praddy; he saw Praddy selling marijuana four to five times a week on Raleigh Place,

rather than on Church Avenue. (See Tr. 714.) He also saw Praddy with Dowdie, Kiond, "Joe," and numerous others (id. at 699-701) most of whom Dowdie had identified as members of the Crew (see, e.g., id. at 327, 460-64). McQuilkin testified that he saw Praddy and Kiond together selling marijuana "[l]ike four, five times a week" (id. at 699), "[e]very week" (id.), selling marijuana "hundreds of times" (id. at 714). "[H]undreds," he said, was "not an exaggeration." (Id.)

Praddy contends that the testimony of McQuilkin should be entirely disregarded. He bases this contention on the facts that Count Eleven of the superseding indictment charged that Praddy had murdered Belize, that McQuilkin testified that he saw Praddy shoot Belize, and that the jury was unable to reach a verdict on Count Eleven, and on the further fact that when Praddy was thereafter retried for that alleged murder he was acquitted. The contention that McQuilkin's testimony should be disregarded is factually and legally meritless. First, the superseding indictment alleged the fact that Praddy killed Belize "intentionally." The shooting occurred at about 9:30 p.m. on a public street in front of an open store (see id. at 911, 716-20), in plain view of those present or passing by (see, e.g., id. at 720). At trial, Dowdie testified that he had quizzed Praddy about the shooting of Belize, and Praddy told him that Belize had tried to grab Praddy's gun and had been shot accidentally. (See id. at 378.) Thus, in light of all the evidence, the jury plainly did not need to reject McQuilkin's testimony that he saw Praddy shoot Belize in order to find itself unable to determine whether in fact that shooting was intentional. Second, as a matter of law, as discussed above, a jury is entitled to believe parts and disbelieve other parts of a given witness's testimony. Thus, even if the jury did not credit McQuilkin's testimony about witnessing Praddy shoot Belize, it was entitled to credit McQuilkin's testimony as to Praddy's drug-dealing activities.

In sum, the evidence at trial included testimony that Praddy and Dowdie worked together, with Dowdie selling or consigning marijuana to Praddy, and Praddy informing Dowdie of interlopers on the block; that Praddy also bought marijuana from Dowdie's lieutenants; that Praddy and Lindsey sold marijuana on Church Avenue on a daily basis; that Praddy also sold marijuana four or five times a week on Raleigh Place; and that Praddy and one of Dowdie's lieutenants worked together selling marijuana hundreds of times. The evidence was plainly sufficient to permit a rational juror to find beyond a reasonable doubt that Praddy was a knowing member of the Raleigh Place Crew conspiracy to distribute marijuana.

B. Praddy's Participation in the Conduct of the RICO Enterprise

On the RICO counts, Counts One and Two, Praddy was convicted of violating 18 U.S.C. §§ 1962(c) and (d). Those subsections provide in pertinent part as follows:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

18 U.S.C. §§ 1962(c), (d) (emphases added). RICO defines "'enterprise'" to "include[] . . . any union or group of individuals associated in fact," id. § 1961(4); it defines "'racketeering activity,'" to include federal drug trafficking felonies, id. § 1961(1). "When read in conjunction with the language of § 1962(c), RICO's conspiracy provision [§ 1962(d)] proscribes an agreement 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity.'" United States v. Viola, 35 F.3d 37, 43 (2d Cir. 1994), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997).

In Reves v. Ernst & Young, 507 U.S. 170 (1993), the Supreme Court interpreted subsection (c) as follows:

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," [in violation of § 1962(c),] one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

Reves, 507 U.S. at 179 (footnote omitted) (second "some" emphasized in original; other emphases added). Thus, to be convicted of violating § 1962(c), the government must prove that the defendant "participate[d] in the operation or management of the enterprise itself." Reves, 507 U.S. at 185 (emphasis added).

The indictments in the present case charged that the Raleigh Place Crew was a RICO enterprise, that is, a group of individuals associated in fact, functioning as a continuing unit, for the purpose of selling drugs in the Raleigh Place area. In challenging his convictions on Counts One and Two, Praddy does not contend that the government failed to prove that the Crew constituted such an enterprise. Rather, he contends that the evidence was insufficient to show that he "played some part in the operation or management of the enterprise" (Praddy brief on appeal at 21 (internal quotation marks omitted)) or that he knowingly entered into an agreement to participate in the conduct of the enterprise. We reject these contentions as well.

The evidence discussed above in Part II.A., which sufficed to prove that Praddy was a member of the conspiracy to distribute marijuana in the Raleigh Place area, likewise sufficed to

-11-

prove that he was a member of the RICO enterprise. In addition, there was sufficient evidence to show that Praddy was not merely a low-level member of the enterprise, a worker who simply followed the orders of others, but was instead one who participated in, and conspired to participate in, the operation of the enterprise. Dowdie testified that most members of the Raleigh Place Crew were "bosses"--all collaborating on controlling the block and excluding interlopers who would sell during the Crew's selling hours (Tr. 374, 461-62); all having the authority to give orders to those Crew members who were workers (see id. at 516); and all having discretion to choose their own marijuana suppliers (see id. at 463-64). Dowdie testified that Praddy did not work "for" Dowdie (id. at 454), but rather worked "with" him (id. at 310), and that Praddy was one of the bosses (see, e.g., id. at 461). Praddy, in selling the marijuana he had purchased, was selling independently, with Dowdie's awareness of Praddy's selling activities. (See id. 517-18.)

Praddy himself testified that he had suppliers other than Dowdie and Dowdie's lieutenants, and that Praddy alone decided where and from whom to purchase the marijuana he would resell. (Tr. 1120-21, 1128-29, 1131-32.) We conclude that the evidence was sufficient to permit the jury to find that Praddy was a member of the marijuana distribution conspiracy, that he had discretion with respect to his choice of suppliers and his selling locations, and that he agreed to, and did, participate in the operation of the RICO marijuana distribution enterprise. We thus affirm Praddy's convictions on Counts One and Two.

## III. THE FIREARM CONVICTION

On Count Fourteen, Praddy was convicted of possessing a firearm during and in relation to his participation in the Raleigh Place marijuana trafficking conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A), a conviction that subjected him to a five-year term of imprisonment that was required to be served consecutively to his prison term on the other counts, see id. § 924(c)(1)(A)(i). Although there was clear evidence that Praddy possessed a gun during and in relation to his marijuana selling activity in 2004 (see Tr. 203-07 (police officer testifying that when he arrested Praddy, who was carrying a backpack, the officer found in the backpack a gun and 27 ziplock bags of marijuana)), Praddy contends that his prosecution on Count Fourteen was barred by the statute of limitations. We agree.

The statute of limitations on a § 924(c) offense is five years. See 18 U.S.C. § 3282(a). In connection with the present case, Praddy was first arrested in June 2009 and was first charged with possession of a firearm in the superseding indictment filed in July 2010. At trial, Praddy and the government stipulated that he had been arrested in April 2004, had pleaded guilty to a New York State gun possession charge, and spent a year in prison for that conviction. The government presented no evidence as to Praddy's possession of a gun after his arrest in 2004.

Despite proffering no evidence that Praddy possessed a gun within five years prior to the July 2010 filing of the superseding indictment charging Praddy with the § 924(c) offense, the government contends that the charge was timely. Pointing out that the statute of limitations on a given offense does not begin to run until the offense is complete, the government argues that conspiracy is a continuing offense and that this Court ruled in United States v. Payne, 591 F.3d 46,

69 (2d Cir. 2010) ("Payne"), that possession of a gun during and in relation to a narcotics conspiracy is therefore itself a continuing offense that does not end until the conspiracy ends. (See Government brief on appeal at 55-56.)

Neither Payne nor reason supports the government's position in its case against Praddy. In Payne, the jury had found that Payne used or carried a gun within the five-year period prior to the commencement of the prosecution. See 591 F.3d at 69. Payne invoked the statute of limitations with regard to sentencing, arguing that he should not have been subject to an enhanced sentence for discharging the gun, see 18 U.S.C. § 924(c)(1)(A)(iii) (requiring the imposition--in addition to the punishment provided for the underlying drug-trafficking crime--of a 10-year term of imprisonment "if the firearm was discharged"), because there was no evidence that, within the five years prior to prosecution, while he carried the gun, the gun had been discharged, see 591 F.3d at 69. We rejected Payne's challenge, stating as follows:

> Conspiracy is a continuing offense. . . . A continuing offense is, in general, one that involves a prolonged course of conduct; its commission is not complete until the conduct has run its course. . . . When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a continuing offense, the § 924(c)(1) crime itself is a continuing offense. . . . In our view, § 924(c)(1) does not define a 'point-in-time' offense when a firearm is used during and in relation to a continuing crime of violence.[]

> Because the narcotics distribution conspiracy that was a predicate of Payne's firearms offense was a continuing crime, Payne's firearms offense was likewise a continuing offense, rather than a "point-in-time" offense. And because . . . "brandishing and discharging [are] sentencing factors to be found by the judge, not offense elements to be found by the jury," Harris[ v. United States], 536 U.S. [545,] 556 [(2002)], the district court could properly consider, in determining Payne's appropriate sentence, whether Payne discharged a firearm at any point during the continuation of his § 924(c)(1)(A) offense.

-14-

Payne, 591 F.3d at 69 (other internal quotation marks omitted) (emphases added). We also noted that in sentencing a defendant, "a district court may properly rely on acts performed outside the five-year statute-of-limitations period as 'relevant conduct' in calculating the defendant's term of imprisonment under the Guidelines." Id.; see, e.g., United States v. Silkowski, 32 F.3d 682, 688 (2d Cir. 1994).

In Payne, unlike the case with respect to Praddy, there had been no termination of the defendant's gun possession by reason of a prior arrest and seizure of the gun. Thus, it was within the realm of reason to characterize Payne's firearm offense as one that continued through the life of the conspiracy.

In the present case, the gun on which the government relies for Praddy's § 924(c) conviction was the gun he possessed in 2004. When Praddy was arrested in 2004, that gun was taken from him by state law enforcement officers. The government made no effort to prove at trial that Praddy possessed any gun thereafter. Apparently, it had no such evidence. (See government's post-judgment letter to the district court dated January 30, 2012, at 4 ("The government does not contend that [Praddy] carried a gun continually 'throughout' the entire conspiracy, and in fact the specific instances in which [Praddy] personally possessed a gun occurred, to the government's knowledge, in 2004 or before." (emphasis added)).) Rather, the government contends that simply because Praddy possessed the gun in connection with his membership in the Raleigh Place marijuana conspiracy, his possession of the gun must be deemed to have continued even after the gun was seized from him by the police--as reflected in the presentation by the Assistant United States Attorney ("AUSA") at the oral argument of this appeal ("Oral Argument"):

> JUDGE KEARSE: What's the evidence of [Praddy's] gun possession within five years' prior to the filing of the indictment in this case?

AUSA: Your Honor, I submit that the government did not have to prove that he actually possessed a gun within five years of 2010. . . .

JUDGE KEARSE: Does that mean that there is no evidence of gun possession during that period?

AUSA: We did not put forth evidence that he possessed a gun after 2004, when he was apprehended, Your Honor.

JUDGE KEARSE: You're resting the gun possession charge on the gun he possessed earlier, for which he was arrested prior to this five year period?

AUSA: Yes, Your Honor.

JUDGE KEARSE: And presumably when they arrested him on the gun charge, they took the gun?

AUSA: Yes, Your Honor.

JUDGE KEARSE: What's the sense of imputing to him gun possession after he has been arrested and had the gun seized?

AUSA: Your Honor, because he was convicted of a continuing offense. The marijuana distribution conspiracy that was the predicate for the 924(c) charge was a continuing crime, and that's what this Court said in United States v. Payne in 2010.

JUDGE KEARSE: But in Payne, there was no intervening arrest and seizure of the gun, was there?

AUSA: No, but my understanding of Payne is that if the predicate offense is a conspiracy, as it was here, the length of the conspiracy starts the clock for the statute of limitations, and the statute of limitations clock began to run in 2009, because that is when the government put forth evidence to prove when the conspiracy ended. So the indictment, as well as his conviction, was well within the statute of limitations. Basically, we had 5 years after 2009 to charge him with the gun possession charge . . . for the 924(c) charge.

JUDGE KEARSE: For the gun that was seized from him in 2004?

AUSA: Yes, yes, because that was not a point-in-time offense. That was a continuing offense.

JUDGE KEARSE:  <u>How did it continue after the gun was seized from him</u>?

AUSA:  <u>Because it was part of the broader marijuana distribution conspiracy</u>.

(Oral Argument (emphases added).)

As indicated in this colloquy, the government acknowledged that, unlike in the present case, there was no arrest and seizure in <u>Payne</u> that interrupted Payne's gun possession.  Nor was the government able to point to any case in which the continuing-offense theory had been applied to a defendant whose actual gun possession had been terminated by a law enforcement seizure of the gun:

JUDGE STRAUB:  Do you have a case to support this particular factual circumstance?

AUSA:  With respect to the 924(c) charge, Your Honor, or with respect to . . . ?

JUDGE STRAUB:  With respect to the issue that you had just been discussing with Judge Kearse, whether this continuing offense can be interrupted by the fact that the gun was taken away from him?

AUSA:  No, Your Honor.  The language I have is specifically from <u>United States v. Payne</u>, where this Court said that when the defendant is convicted . . . .

JUDGE STRAUB:  I understand that. But I'm asking you if there's a case to support the unusual set of circumstances that we have here?

AUSA:  Not of which I am aware of today, Your Honor.

(Oral Argument.)

Nor are we aware of any such authority.  While ordinarily a defendant's possession of a firearm is an ongoing offense, that offense normally runs its course when the possession has ended.  <u>See generally</u> <u>United States v. Dillard</u>, 214 F.3d 88, 94 n.5 (2d Cir. 2000) (with respect to possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), "the limitations period runs

from any act of possession that is the subject of the prosecution," and the "'course'" of the commission of th[at] offense is the course of the illegal possession"). And while ordinarily when the gun possession is during and in relation to a conspiracy, which is a continuing offense, that possession is presumed to continue until the underlying conspiracy offense has run its course, it would defy all reason to give effect to that presumption after such time as the gun has in fact been seized by law enforcement authorities. We decline to uphold Praddy's conviction under § 924(c)--a conviction that subjects the defendant to imprisonment for an extra five years--on the basis of the fiction that, simply because he continued to sell marijuana, he continued to possess the gun in question after it was seized from him by the police.

We reverse Praddy's conviction on Count Fourteen, and we remand for resentencing de novo on the RICO and narcotics counts, see, e.g., United States v. Graham, 691 F.3d 153 (2d Cir. 2012).

## IV. SENTENCING CHALLENGES

For his RICO and drug trafficking offenses (Counts One, Two, Four, Five, Six, Seven, and Eight), Praddy was sentenced principally to 120 months' imprisonment. He contends that that 120-month term is substantively unreasonable because the district court imposed that sentence on the basis that the Raleigh Place conspiracy involved more than 100 kilograms of marijuana, that Praddy was a member of that conspiracy for a lengthy period of time, and that the gun Praddy had carried in 2004 was loaded. Praddy contends that the court in fact imposed that sentence because it believed Praddy had killed Belize (i.e., Kevon Simon). (See, e.g., Praddy brief on appeal at 35-36 (contending that "the court seized on the temporal span of the conspiracy and the amount of marijuana dispensed"

"[i]n a thinly-veiled attempt to impose a sentence appropriate for the killer the district court believed him to be").) Challenges to the substantive reasonableness of the sentence are reviewed under a standard that is akin to abuse of discretion. See, e.g., Gall v. United States, 552 U.S. 38, 46 (2007); United States v. Fernandez, 443 F.3d 19, 34 (2d Cir. 2006). We find Praddy's challenges to be without merit.

The presentence report ("PSR") prepared on Praddy concluded, as revised, that Praddy's Guidelines offense level was 43 and that the advisory-Guidelines recommended range of imprisonment for his narcotics and RICO convictions was 240 months. That conclusion was based in part on the premise that Praddy had killed Belize, although the jury at Praddy's joint trial with Kiond Jones had been unable to reach a verdict on that charge, and at a subsequent trial of Praddy a jury acquitted him of that charge. At the sentencing hearing, the district court expressly declined to find that Praddy had killed Belize. (See Sentencing Transcript, October 28, 2011 ("S.Tr."), at 17 ("I'm not going to hold him accountable for the murder"); id. at 29 ("I'm not sentencing him as a killer"); id. ("the fact is I'm not sentencing him for killing Kevon Simon").)

Having determined that it would not sentence Praddy on the basis that he had killed Belize, the court first recalculated the advisory-Guidelines-recommended imprisonment range for Praddy's offenses and then considered whether that range was appropriate in light of the factors set out in 18 U.S.C. § 3553(a). Noting that the jury had found that the Raleigh Place marijuana conspiracy involved 100 or more kilograms of marijuana, the court determined that Praddy's base offense level was 26, see Guidelines § 2D1.1(c)(7); the court then found that a two-step upward adjustment for obstruction of justice was warranted because Praddy perjured himself at trial, both when he testified about not having a reason for buying the gun he possessed when he was arrested (see Tr. 1152-53) and when he testified that he had not possessed marijuana when he was arrested in

-19-

possession of the gun (see id. at 1154). (See S.Tr. 21-23, 52-53; id. at 52 ("I find that he's lied at least twice.") With the obstruction-of-justice adjustment, Praddy's offense level was 28. Given his criminal history category of I, the advisory-Guidelines-recommended range of imprisonment for Praddy's narcotics and RICO offenses was 78-97 months.

The district court, after considering the factors set out in 18 U.S.C. § 3553(a), including "the nature and character of [Praddy's] criminal misdeeds" (S.Tr. 24), determined that an above-Guidelines sentence of 120 months was appropriate. The court based that determination on the evidence that Praddy was a member of the Raleigh Place conspiracy for some six years, that the jury found that the conspiracy involved at least 100 kilograms of marijuana--an amount that was amply supported by Dowdie's testimony that the Raleigh Place Crew sold "thousands of pounds" of marijuana (1,000 pounds being the equivalent of more than 450 kilograms), and that the gun Praddy had carried was loaded.

Praddy argues that in holding him responsible for 100 kilograms of marijuana, "the district court appeared to hold [him] responsible for the acts of his coconspirators" and did so without making any finding that their collective actions were foreseeable to Praddy. (Praddy brief on appeal at 37.) We see no abuse of discretion in the court's consideration of either the nature of Praddy's participation in the conspiracy or the quantity of marijuana attributed to him. The court found that Praddy was not just casually associated with the drug conspiracy but had "extensive involvement" in it (S.Tr. 53) and participated in it for some six years, during which he and his coconspirators were on the street selling marijuana daily (see id. at 37). This finding was entirely supported by the evidence described in Part II above, that Praddy--according to his own testimony--sold marijuana from 2003 until his arrest in 2009; and that Praddy, according to testimony from his customers and his coconspirator Dowdie, sold marijuana "daily" or at least four or five times a week "every week," and

was observed by one witness selling marijuana with one of Dowdie's lieutenants "hundreds of times." In light of the evidence, the court's decision to hold Praddy responsible for the amount sold by the conspiracy was authorized by the Guidelines, see Guidelines § 1B1.3 Application Note 2, and by caselaw, see, e.g., United States v. Chavez, 549 F.3d 119, 136 (2d Cir. 2008), and was not an abuse of discretion.

Finally, Praddy acknowledges that "the fact that a weapon was loaded clearly has some sentencing significance . . . ." (Praddy brief on appeal at 35.) His challenge is only to "the weight ascribed to" that fact (id.), and is unpersuasive. The sentencing judge has broad discretion to consider all relevant information in determining an appropriate sentence, see, e.g., United States v. Rodriguez-Gonzalez, 899 F.2d 177, 182 (2d Cir. 1990) (affirming sentencing enhancement based on constructive possession of a "loaded gun"), and we see no basis for second-guessing the weight the district judge assigned to this factor in the present case.

CONCLUSION

We have considered all of Praddy's contentions on this appeal and, except with respect to the statute-of-limitations challenge to his conviction under 18 U.S.C. § 924(c) (Count Fourteen), have found them to be without merit. Praddy's conviction on Count Fourteen is reversed; his convictions on all other counts are affirmed. The matter is remanded for resentencing de novo on the affirmed counts, in light of the reversal of the conviction on Count Fourteen.