**UNITED STATES of America**

v.

**Ronell WILSON, Defendant.**

**No. 04–CR–1016 (NGG).**

United States District Court,
E.D. New York.

Sept. 4, 2013.

Carter H. Burwell, Colleen Elizabeth Kavanagh, Jason Allen Jones, Celia Cohen, Shreve Ariail, United States Attorneys Office, Jack Smith, U.S. Attorney's Office, Brooklyn, NY, for United States of America.

Colleen Quinn Brady, The Law Office of Colleen Quinn Brady, David Stern, Robert Soloway, Rothman, Schneider, Soloway & Stern, P.C., Richard Jasper, Law Offices of Richard Jasper, New York, NY, Michael N. Burt, Law Office of Michael Burt, San Francisco, CA, for Defendant.

### MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

After a jury of his peers unanimously issued its binding recommendation that Defendant Ronell Wilson be sentenced to death, he has moved for an order setting aside that jury's verdict and granting him a new penalty phase trial. Because each of the alleged errors in the recent trial identified by Wilson is either (1) not an error at all, or (2) not sufficiently prejudi-

cial to warrant a new trial, Wilson's motion is DENIED. The court will sentence him to death on Tuesday, September 10, 2013, at 2:00 p.m. in the Ceremonial Courtroom.

## I. BACKGROUND

The history of this long-running case is well known. On March 10, 2003, Defendant Ronell Wilson murdered New York City Police Detectives James V. Nemorin and Rodney J. Andrews by shooting each of them once in the back of the head at point-blank range, killing them instantly. Following a trial that began in October 2006, the jury found Wilson guilty of all the crimes charged in the Second Superseding Indictment and returned a death sentence. (Jury Verdict (Dkt. 351); 1st Special Verdict Form (Dkt. 360).) On appeal, the death verdict—but not the underlying convictions—were abrogated by a divided court. *United States v. Whitten*, 610 F.3d 168 (2d Cir.2010).

On remand, Wilson argued that he is mentally retarded and therefore ineligible for the death penalty under the Eighth Amendment, as interpreted by *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3596(c). The court held a nine-day

hearing and rejected this claim. (*See* Feb. 7, 2013, Mem. & Order (Dkt. 1015).)

The court then conducted seven weeks of voir dire—during which nearly 2,000 prospective jurors completed questionnaires and 419 were interviewed in person—followed by a five-week penalty phase re-trial. (*See generally* June 6, 2013, Mem. (Dkt. 1273).) On July 24, 2013, the second jury unanimously issued its binding recommendation that Wilson be sentenced to death. (2d Special Verdict Form (Dkt. 1437).)

Wilson now moves for a third penalty phase pursuant to the Fifth, Sixth, and Eighth Amendments to the Constitution, and 18 U.S.C. § 3595(c). (New Trial Mem. (Dkt. 1461).) The Government filed its opposition (New Trial Opp'n (Dkt. 1463)), and Wilson replied (New Trial Reply (Dkt. 1464)).

## II. STANDARD OF REVIEW [1]

### A. Rule 29

■■■ After a jury recommends a sentence of death, the defendant may attack the verdict by challenging the sufficiency of evidence underlying a particular aggravating factor.[2] "The standard of review with respect to sufficiency challenges is well established. The defendant bears the

---

1. Wilson argues generally that he is entitled to a new penalty proceeding "pursuant to the Fifth, Sixth and Eighth Amendments to the United States Constitution, and 18 U.S.C. § 3595(c)." (New Trial Mem. at 1.) The substance of his arguments and cited authority, however, demonstrate that he requests a new penalty phase pursuant to the standards set forth in Federal Rules of Criminal Procedure 29 (regarding his argument about the sufficiency of the future dangerousness evidence) and 33 (regarding the allegedly improper comments made by the Government at trial).

2. Some courts have held that Rule 29, which by its terms only permits the court to "enter an acquittal," Fed.R.Crim.P. 29(c), does not

apply to a capital penalty phase proceeding. *See, e.g., United States v. Runyon*, 652 F.Supp.2d 716, 718 (E.D.Va.2009); *United States v. Sampson*, 335 F.Supp.2d 166, 198–202 (D.Mass.2004). Nevertheless, a district court's inherent authority permits it to set aside a jury's death sentence recommendation under the same standard applied to typical Rule 29 motions. *See Runyon*, 652 F.Supp.2d at 718 ("[T]he court retains its inherent powers to allow the defendant to file post-trial motions regarding the sufficiency of the evidence, even where no explicit rule or law provides such an opportunity."); *Sampson*, 335 F.Supp.2d at 198–202.

heavy burden of 'show[ing] that no rational trier of fact could have found'" the aggravating factor proven beyond a reasonable doubt. *United States v. Praddy*, 725 F.3d 147, 152 (2d Cir.2013) (citation omitted) (alteration in original). The evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor," *id.*, and "choices between competing interests [and] [a]ssessments of witness credibility ... lie solely within the province of the jury," *United States v. Payne*, 591 F.3d 46, 60 (2d Cir.2010).

### B. Rule 33

 "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R. Crim.P. 33(a). "A defendant asserting that a prosecutor's remarks warrant a new trial [under Rule 33] 'face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial.'" *United States v. Banki*, 685 F.3d 99, 120 (2d Cir.2012) (quoting *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir.1993)) (first alteration added). "Even if a remark is deemed improper, it must cause 'substantial prejudice' to result in a new trial." *Id.* (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999)). And to determine whether a defendant has suffered "substantial prejudice," the court should consider "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir.1990); *accord Banki*, 685 F.3d at 120.

### III. DISCUSSION

### A. Sufficiency of the Future Dangerousness Evidence

 Wilson first argues that a new penalty phase is warranted because the evidence presented in support of the Government's future dangerousness aggravating factor was legally insufficient. He is mistaken.[3]

Simply put, overwhelming evidence supported the jury's future dangerousness finding. Among other things, the Government elicited testimony documenting Wilson's pattern of violence beginning from age eleven. (*See* June 26, 2013, Trial Tr. at 4780:21–4800:2 (testimony of former Officer Paul Alaimo, describing how he arrested Wilson for throwing a bottle at a police van at age eleven).) This behavior persisted during adolescence and continued throughout his recent time at the Metropolitan Detention Center ("MDC"), where he verbally threatened staff and inmates, refused to obey orders knowing that use of force by staff would be necessitated, and brandished a makeshift weapon, or "shank." (*See* July 3–8, 2013, Trial Tr. at 5814:21–5989:22, 5919:9–5933:17 (testimony of Inmate Kevin Johansen describing Wilson's threats and manipulation of staff); July 9, 2013, Trial Tr. at 6179:8–6283:17 (testimony of former Inmate Anthony Rodriguez recounting how Wilson brandished a shank); Ex. PP–80 (video of Wilson's forcible extraction from the recreation deck at the MDC).) The jury also heard extensive testimony about Wilson's membership in the Bloods gang, including

---

**3.** The Government argues that even if there was insufficient evidence to support the future dangerousness aggravating factor, Wilson is not entitled to a new trial because under the FDPA, the Government needed to only prove one aggravating factor. (New Trial Opp'n at 3–5.) Because sufficient evidence supported the jury's future dangerousness finding, the court need not resolve this issue.

(1) his desire to obtain higher status; (2) how he intimidated others and was capable of inciting violence because of his Bloods membership; and (3) assaults he committed that were characteristic of Bloods members. (*See, e.g.,* June 27, 2013, Trial Tr. at 4995:11–5070:14 (testimony of Paublo Centeno, who testified that Wilson slashed his cheek with a knife, which other witnesses testified is a mark of an attack by a Bloods member); July 1, 2013, Trial Tr. at 5419:4–5462:24, July 2, 2013, Trial Tr. at 5502:10–5615:8 (testimony of former Inmate Shabucalik Geralds describing Wilson's Bloods activity at the MDC); July 2, 2013, Trial Tr. at 5630:16–5646:14 (testimony of Correctional Officer Gregory Harrison describing how Wilson resisted officers and told other inmates to "pop off," a Bloods code word meaning "attack").)

Wilson's attempt to characterize this future dangerousness evidence as not very serious (*see* New Trial Mem. at 3–8) fails. Because the court must "draw all reasonable inferences in the government's favor," *U.S. v. Brown,* 441 F.3d 1330, 1371 (11th Cir.2006), and given the mountain of evidence documenting Wilson's violent behavior in prison and out, a rational trier of fact certainly could have determined beyond a reasonable doubt that Wilson is "likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others," (Notice of Intent to Seek the Death Penalty (Dkt. 174) at 4). *See Praddy,* 725 F.3d at 152–53. Wilson's arguments to the contrary were better suited for cross-examination and summation; at this stage, they must be rejected. *See Payne,* 591 F.3d at 60.

■ Wilson also contends that he is entitled to a new trial because the Government purportedly failed to introduce evidence that the future dangerousness subfactors—Wilson's (a) continuing pattern of violence; (b) lack of remorse; (c) low rehabilitative potential; and (d) membership in a criminal street gang (*see* Notice of Intent to Seek the Death Penalty at 4–5)—are indicative of future dangerousness in prison. Assuming that such link is even necessary, however, the Government did proffer evidence connecting these subfactors with future instances of violence. For instance, Wilson's long history of past criminal conduct obviously correlated with his commission of the two murders and with more recent acts of violence in prison. Similarly, Wilson repeatedly told another inmate at the MDC that "he had killed policem[e]n and he didn't care anymore"—a clear, recent expression of a lack of remorse—meaning that "with the type of case against him, he could do anything, he could attack any person because he was a violent person." (July 8, 2013, Trial Tr. at 5964:16–5965:7 (testimony of Inmate Tommy Germosen).) In other words, taken in the light most favorable to the Government, the evidence presented demonstrates that Wilson himself described how his lack of remorse increased the likelihood of future violence.

Moreover, the evidence relating to Wilson's admitted Bloods membership correlates with his future dangerousness and supports the jury's finding. Both Investigator William Sheridan and Shabucalik Geralds competently discussed how Bloods members accomplish acts of violence in federal prison. As the Second Circuit indicated concerning Geralds's testimony at the first penalty phase, the jury was free to credit such evidence because a reasonable factfinder could believe that Geralds had personally witnessed the behavior of Wilson and other Bloods members in federal prison. *See Whitten,* 610 F.3d at 192 & n. 16. Additionally, Wilson threatened to have fellow Bloods members commit vio-

lent acts on his behalf. (*See* June 27, 2013, Trial Tr. at 5174:5–5175:8 (testimony of Victor Vazquez, describing how Wilson robbed him and threatened to have fellow Bloods members assault Vazquez if he reported the incident to the police); July 1, 2013, Trial Tr. at 5358:9–5359:18 (testimony of Correctional Officer Lizette Tamayo describing how Wilson threatened to have his fellow Bloods members act as his "backup"); July 8, 2013, Trial Tr. at 6062:16–6063:7 (testimony of Inmate Juan Infante describing how Wilson threatened to have his "goons" attack another inmate).) Wilson even slashed the cheek of Paublo Centeno, which is a signature Bloods assault. (*See* June 27, 2013, Trial Tr. at 4995:11–5070:14.) This evinces a clear link between Wilson's Bloods membership and the likelihood of future acts of violence.

 Finally, the Government's alleged misstatements of the evidence concerning Wilson's future dangerousness—including (1) the presence of any individuals in the visiting room when Wilson destroyed the Plexiglas divider; (2) whether Wilson intended to hurt anyone when he was forcibly extracted from the recreation deck at the MDC; and (3) Wilson's manipulation of Nancy Gonzalez and Lorie Nicholas, MDC employees—do not warrant a new trial. For one thing, a reasonable jury could infer many of the conclusions proffered by the Government: A portion of the extraction video depicts Wilson jumping at the guards as they enter the recreation deck. (*See* Ex. PP–80). And, as the court

previously ruled at trial, evidence in the record supported an inference that Wilson manipulated Nancy Gonzalez into having a sexual relationship: Wilson had manipulated other staff, and Gonzalez placed her career in jeopardy for Wilson, exposed herself to criminal liability, and even permitted confrontations between Wilson and another inmate. (*See* July 23, 2013, Trial Tr. at 7754:6–7755:17.) Moreover, destroying the visiting room window—even if no one else was present—is inferentially indicative of future danger. Any misstatements by the Government concerning the details of this incident were cured by the court's repeated instructions charging the jury as to its role as the sole arbiter of the facts and that counsel's comments were not evidence. (*See infra* Part III.B.1.)

Given the extensive record documenting Wilson's violent past, his lack of remorse for his crimes, his recent acts of violence, and his status in the Bloods, a rational trier of fact could have found the future dangerousness aggravating factor proven beyond a reasonable doubt. *See Praddy*, 725 F.3d at 152–53.

### B. Comments by the Prosecution [4]

#### 1. *Purported Misstatements of Evidence*

 Wilson strenuously argues that the Government's alleged misrepresentations of certain evidence during summation warrant a new trial. In particular, Wilson stresses that the Government misstated the amount of time that elapsed between

---

**4.** As a preliminary matter, Wilson concedes that he did not object to every purported error identified in the instant motion. (*See* New. Tr. Mem. at 20 n. 3.) Instead, he argues that, at least with respect to comparative justice arguments, "the defense had flagged the impropriety of [such] arguments ... in its motion to prohibit certain forms of prosecutorial misconduct on summation." (*Id.* (citing Def. Arg. Mem. (Dkt. 1223)).) Because the

court concludes that Wilson's motion fails even if he had timely objected to each alleged instance of misconduct, it need not decide whether Wilson's broad, omnibus motion constitutes a contemporaneous objection for purposes of later review. *See United States v. Fell*, 531 F.3d 197, 228–29 (2d Cir.2008) (reviewing only for plain error "[b]ecause Fell did not raise a contemporaneous objection"); *see also* Fed.R. Crim.P. 51(b).

Wilson killing Detective Andrews and Detective Nemorin. (New Trial Mem. at 11–12.)

In its summation and rebuttal, the Government indicated that the two murders were separated by "minutes" (see July 23, 2013, Trial Tr. at 7775:4, 7776:25, 7777:9–12, 7909:14–16), and in support referred the jury to the parties' stipulation that summarized the testimony of Scott Van Campen ("Van Campen Stipulation"), a witness to the murders who testified at the first trial in 2006 (id. at 7909:20–25). However, the Van Campen Stipulation stated that this witness recalled hearing "two gunshots two to five seconds apart, possibly as long as five to ten seconds" apart. (June 27, 2013, Trial Tr. at 5184:10–13.) This, according to Wilson, merits a new trial. He is mistaken.

Although the Government admittedly did not accurately recall the contents of the Van Campen Stipulation (see New Trial Opp'n at 17), the prejudice caused by this error is minimal. Wilson argues that the Government misrepresented the time between the two murders "to support [its] argument that the murders were particularly heinous," and disparaged defense counsel in the process (New Trial Mem. at 11). But even under the defense's version of events—that is, that Wilson killed Detective Nemorin "seconds," rather than "minutes," after he shot Detective Andrews—Wilson "had 'a choice' to spare Detective Nemorin as he 'begged . . . for mercy,' but [Wilson] pulled the trigger instead." (Id. (quoting July 23, 2013, Trial Tr. at 7777:17–24 (Government's summation)).) In other words, even if the Government had not made these misstatements, the jury would have been faced with multiple pieces of evidence indicating that Wilson made a conscious choice to murder Detective Nemorin as he pleaded for his life, supporting the Government's broader theme. (See June 25, 2013, Trial Tr. at 4559:1–3 (testimony of Jesse Jacobus, estimating that the two murders were separated by "[p]robably about a minute, some seconds if that").) In fact, in its rebuttal, the Government attempted to downplay this discrepancy, which was highlighted by defense counsel, stating that "the significance of that [inconsistency] is lost on the Government." (July 23, 2013, Trial Tr. at 7909:17–18.) Thus, any harm that occurred from the Government's misstatements is minimal at best and not sufficient to warrant a new trial.

Moreover, any such prejudice was militated by the fact that the jury had the Van Campen Stipulation at its disposal during deliberations. The prosecution even encouraged the jury to examine this evidence, which would clarify any confusion and, if anything, impugn the Government's credibility with the jury, not the defense's. (See id. at 7909:20–22 ("When you go back and look at those stipulations, you'll see that the defendant signed a stipulation saying that Scot Van Campen . . . said that several minutes transpired between the time of the first shot and the second shot.").) Additionally, the court's repeated instructions—including the one administered because of this error—directed the jury that arguments by counsel were not evidence, and that the jury was the sole judge of the facts, which cured any possible harm. (See, e.g., July 24, 2013, Trial Tr. at 7956:23–7957:1 ("I remind you that you alone decide what the facts are, and that the comments by counsel including opening statements and closing arguments are not evidence.").)

■■■ The same is true for Wilson's other claims of misstatements of evidence. For instance, the Government's comments about Wilson's intellect were a reasonable rebuttal to defense counsel's contention, in describing the crimes, that he is not the

"brightest bulb in the chandelier." (July 23, 2013, Trial Tr. at 7850:21–23.) Defense counsel had implied that Wilson killed the two police officers because of a diminished mental capacity (*see id.*), and the Government simply rejoined by casting doubt on whether he was unable to discern that the two victims were police officers, arguing that he purposely murdered them in an attempt to not return to prison. (*See id.* at 7917:10–18 (stating that "your bulb doesn't have to burn too bright to come up with, I don't want to go to jail, I'm going to shoot this person in the head," adding, "his bulb was perfectly fine").) This was not contradicted by any evidence admitted at trial or as part of the *Atkins* hearing. Of course, "[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." *United States v. Williams*, 690 F.3d 70, 75 (2d Cir.2012) (internal quotation marks omitted).

Similarly, the Government legitimately suggested that the jury should draw certain inferences from the evidence concerning Nancy Gonzalez and Wilson's employment as an orderly at the MDC. As mentioned above (*see* supra Part III.A), it was reasonable for the jury to infer, and for the Government to argue, that Wilson manipulated Gonzalez into having sexual encounters.[5] (*See* July 23, 2013, Trial Tr. at 7754:6–7755:17 (denying Wilson's request at trial to preclude argument that Wilson manipulated Gonzalez).) Additionally, given the degree of control that Wilson exerted over the K–81 unit at the MDC, it was reasonable for the jury to infer that Wilson's status as an orderly— which was considered the most desirable prison job (*see* July 1, 2013, Trial Tr. at 5445:18–5446:6 (testimony of Geralds); July 8, 2013, Trial Tr. at 5972:11–5973:1 (testimony of Johansen))—facilitated that control.

Finally, any prejudice caused by these alleged errors was minimal because the Government did not emphasize these points in its closing arguments and the court's instructions reminded the jury of its role as the sole judge of the facts. *See Banki*, 685 F.3d at 120. Wilson's motion for a new trial on this ground is therefore denied.

2. *Comparative Justice Arguments*

■■■ Wilson next argues that the Government improperly compared the plight of the victims with his own future, i.e., a sentence of life in prison without the possibility of release. (New Trial Mem. at 15–20.) These comments do not justify a new penalty phase trial.

Ultimately, this argument amounts to an assertion that the Government's comments at trial improperly encouraged the jury to impose the death penalty based on sympathy for the victims. To the contrary, these comments were a proper exposition of the various mitigating and aggravating factors. Wilson's first mitigating factor was that he will spend the rest of his life in prison

---

5. Wilson's attempt to characterize this argument as a violation of *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), also fails. Given the parties' proffers at trial, there is conflicting information as to whether Gonzalez believed she had been manipulated by Wilson, and the information actually in evidence reasonably supported the Government's argument. (*See* July 23, 2013, Hr'g Tr. at 7754:6–7755:17.) As Wilson requests that the notes of Gonzalez's proffer session with the Government be placed on the docket under seal for appellate review (*see* New Trial Mem. at 14–15 n. 2), both parties shall provide to the court by September 11, 2013, any evidence not already in the record that concerns Gonzalez's belief (or lack thereof) that Wilson manipulated her. This shall include the proffer notes and the relevant tapes of her conversations with another inmate.

without the possibility of release (*see* 2d Special Verdict Form at 8), and during summation defense counsel emphatically and extensively described the misery associated with such a sentence (*see* July 23, 2013, Trial Tr. at 7841:4–7843:6). In response, the Government's attempt to compare the import of that mitigating factor with the strength of the victim impact aggravating factor comported with the weighing process outlined by the FDPA, which necessarily requires a comparison of the arguments proffered by the Government and the defense.

Even assuming that these remarks were improper, the court is left with the firm impression that the prosecution's limited comments referring to both the victims' misery and Wilson's future in prison do not warrant a new penalty phase. For one thing, these observations were not unduly prejudicial because the mountain of evidence admitted (without objection) describing Wilson's heinous crimes and his lack of remorse "naturally and inevitably evoke[d] deep sympathy from the jury, [meaning that the Government's] brief comments were not likely to evoke to any further appreciable degree the jury's sympathy for the victims." *United States v. Johnson*, 495 F.3d 951, 980 (8th Cir.2007).

More importantly, the court carefully and repeatedly instructed the jury not to return any sentence based on sympathy, passion, or other improper considerations. (*See, e.g.*, June 24, 2013, Trial Tr. at 4223:23–4224:1 ("[Y]ou are not free to substitute your own views about circumstances that might warrant capital punishment for those specific circumstances chosen by Congress."); *id.* at 4231:5–7 ("Your decision in this case must be based solely and exclusively upon the evidence received during this trial and not about anything else."); July 24, 2013, Trial Tr. at 7976:24–7977:5 ("In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you. Passion, prejudice, and arbitrary considerations have no role to play in your efforts to reach a just result in this case."); *see also, e.g.*, June 24, 2013, Trial Tr. at 4285:18–24 (instructing the jury, before victim impact testimony, not to allow such evidence to "overwhelm [its] ability to follow the law," adding, "[y]ou must decide the proper punishment without undue passion or prejudice").) The court also repeatedly instructed the jury that comments by counsel were not evidence (*see* June 24, 2013, Trial Tr. at 4284:12–18; July 24, 2013, Trial Tr. at 7956:23–7957:1), further diminishing any harm that these comments may have caused. *See United States v. Batista*, 684 F.3d 333, 342–43 (2d Cir.2012) (denying a Rule 33 motion based on prosecutorial misconduct because, in part, the court provided curative instructions). For these reasons, this ground for a new penalty phase trial is also without merit.

3. *Denigration of Mitigation Evidence*

▮ It is also argued that Wilson is entitled to a new penalty phase trial because the Government improperly encouraged the jury to disregard his mitigation evidence. According to Wilson, the Government requested that the jury not give any weight to Wilson's mitigation case, including his relationship with his friends and family. He is mistaken.

▮ "A prosecutor errs by directing the jury to ignore a proposed mitigating factor." *United States v. Rodriguez*, 581 F.3d 775, 800–01 (8th Cir.2009); *see also Tennard v. Dretke*, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) ("[T]he 'Eighth Amendment requires that the jury be able to consider and give effect

to' a capital defendant's mitigating evidence." (quoting *Boyde v. California,* 494 U.S. 370, 377–78, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990))). However, when viewed "in the context of the entire exchange," a prosecutor may argue that "based on the circumstances of the case, [certain mitigators] are entitled to little or no weight." *Rodriguez,* 581 F.3d at 801 (citation omitted).

Here, the Government did no more than encourage the jury to place little weight on Wilson's proffered mitigating factors. After the Government stated that the pain a death sentence may cause Wilson's family members was "not a concern" to the jury (which shortly thereafter drew an objection), it quickly stressed that "[i]f you want to afford that some weight, that his family members will be upset, you have every right to consider it because we don't think it has much significance because that's an issue between the defendant and his family." (July 23, 2013, Trial Tr. at 7925:1–20.) Viewed in context, then, it is clear that this argument was a reasonable request for the jury to place little—but not necessarily zero—weight on Wilson's mitigating factor. *See Rodriguez,* 581 F.3d at 801. Indeed, the jury unanimously found that Wilson proved this mitigating factor, casting serious doubt on Wilson's claim of prejudice resulting from this isolated comment. (*See* 2d Special Verdict Form.)

■ Nor did the Government "improperly devalue[ ] Mr. Wilson's mitigating evidence generally." (New Trial Mem. at 23.) The Government did not endorse an "eye for an eye" mentality, i.e., that every murderer should be executed. (*See id.*) Rather, the Government contended, based on the reasonable, strategic choice by defense counsel to concede the existence of four aggravating factors—the victim status, contemporaneous convictions, multiple killings, and pecuniary gain factors—that

these alone warranted imposition of the death sentence and outweighed the conceded mitigating factors. This is entirely consistent with the Federal Death Penalty Act and Supreme Court jurisprudence. (*See generally* May 24, 2013, Mem. & Order (Dkt. 1221) (detailing the impact of Wilson's strategic decision to concede the existence of four statutory aggravating factors).) Indeed, the Government stressed to the jury the importance of considering Wilson's mitigation case. (July 23, 2013, Trial Tr. at 7809:15–16 (directing the jury to evaluate the aggravating factors and "then consider the defendant's mitigating factors"); *id.* at 7809:20–22 ("And you should consider these mitigating factors as you engage in the sixth step, the weighing process."); *id.* at 7901:24–7902:3 ("I'd like to take you through a couple points that the defendant has put before you as part of his mitigation case and you should listen to them. Listen to what he said."); *cf. id.* at 7908:16–17 ("I'm not saying you shouldn't consider [Wilson's medical records] in mitigation.").)

Finally, the court's instructions describing how to consider the mitigation evidence and how to weigh the various factors cured any harm caused by the Government's limited comments. *See Bland v. Sirmons,* 459 F.3d 999, 1026 (10th Cir. 2006) ("As long as the jury is properly instructed on the use of the mitigating evidence, the prosecution is free to comment on the weight the jury should accord to it."). The court properly delineated the FDPA scheme and repeatedly instructed the jury to consider all mitigating evidence, reminding it on multiple occasions that mitigating evidence need not be related to, and does not excuse, the murders. (*See* June 24, 2013, Trial Tr. at 4427:2–7; *id.* at 4284:19–22; July 24, 2013, Trial Tr. at 7970:21–24.) The Government even stated to the jury that should any of its

comments during summation conflict with the court's instructions, it should follow the court's charge. (July 23, 2013, Trial Tr. at 7772:24–7773:1.) It is also apparent that the jury followed these instructions—and were not swayed by any allegedly improper comments—given its findings as to numerous mitigating factors. The jury unanimously found fifteen of the twenty-four mitigating factors; eleven jurors found two others; and at least six jurors found three others. (*See* 2d Special Verdict Form.) This strongly implies that the jury was not misled into disregarding Wilson's mitigation evidence, and supports the court's conclusion that it must reject this argument in support of Wilson's request for a new trial. *See United States v. Fell*, 531 F.3d 197, 224 (2d Cir.2008) (rejecting claims that the prosecutors improperly denigrated the mitigating evidence because, in part, the jury found many mitigating factors proffered by the defendant); *United States v. Umana*, No. 3:08–CR–134 (RJC), 2010 WL 3023498, at *14 (W.D.N.C. July 27, 2010).

### 4. *Jurors as Wilson's Victims*

█ Wilson's final argument in support of his request for a new trial is that the Government improperly "invited jurors to think of themselves as victims of Mr. Wilson, because the detectives' murders had impacted them personally as residents of New York City who had lost their protection." (New Trial Mem. at 24.) According to Wilson, the Government's comments concerning the victims' status as police officers " 'were akin to a golden rule violation' " and were "an improper emotional appeal to the passions of the jurors." (*Id.* (quoting *United States v. Palma*, 473 F.3d 899, 902 (8th Cir.2007)).) He is again mistaken.

The few summation remarks cited (but not contemporaneously objected to) by Wilson amount to no more than an appropriate commentary on the victim status and victim impact aggravating factors. References to "*this* city" and "*our* community" (*see* New Trial Mem. at 24 (identifying such comments made by the Government) (emphases added)), when read in context, indicate only that the victims' status as police officers should be taken into consideration in the ultimate weighing process (*see* Notice of Intent to Seek the Death Penalty at 5–6). These limited comments did not improperly place the jury in the position of being considered the victims of Wilson's crimes.

Additionally, even if such comments strayed over the line, they do not require a new trial because they did not cause "substantial prejudice by so infecting the trial with unfairness as to make the resulting [death sentence] a denial of due process." *United States v. Carr*, 424 F.3d 213, 227 (2d Cir.2005) (internal quotation marks and citation omitted). The court repeatedly instructed the jury not to base its verdict on sympathy, passion, or other prejudice. (*See, e.g.,* June 24, 2013, Trial Tr. at 4223:23–4224:1; *id.* at 4231:5–7; July 24, 2013, Trial Tr. at 7976:24–7977:5; *see also, e.g.,* June 24, 2013, Trial Tr. at 4285:18–24.) Moreover, because Wilson objected to the Government's invitation for the jury to "speak with one voice as the conscience of this community" (July 23, 2013, Trial Tr. at 7928:19–22), the court, in an abundance of caution, specifically charged the jury not to speculate about what the views of the victims' families or the "wider public might be," instructing, "[i]t would be improper for those topics to enter your deliberations," (July 24, 2013, Trial Tr. at 7969:17–19).

Accordingly, in light of the jury's findings, the detailed instructions, and the weight of the evidence in support of all the aggravating factors, the challenged comments by the Government, even if improper, did not render the trial fundamentally

unfair and therefore do not warrant a new penalty phase. *See Le v. Mullin,* 311 F.3d 1002, 1015–16 (10th Cir.2002).

\* \* \* \* \* \*

Having presided over three capital penalty phases, the court is convinced that Defendant Ronell Wilson's most recent trial was fair, reasonable, and comported with the law in all respects. Counsel zealously and fairly advocated their positions. The jury was consistently attentive, thoughtful, and grasped the seriousness of deciding the ultimate question of punishment: life versus death. It was not swayed by passion or sympathy. The jury followed the court's instructions, weighed the aggravating and mitigating factors in accordance with the FDPA, and dutifully fulfilled its crucial role in our criminal justice system.

## IV. CONCLUSION

Wilson's motion for a new penalty phase proceeding is DENIED. The court will sentence him to death on September 10, 2013, at 2:00 p.m. in the Ceremonial Courtroom.

SO ORDERED.